Annie G. Summers, Appellant, v. John S. Hopkins, Receiver of the firm of Laughlin & McManus, Robert Laughlin, Charles A. McManus and William King, who were members of the said firm.

*Husband and wife—Conversion of wife's property by husband—Brokers —Commingling of securities.*

A wife having securities in her own name executed blank powers of transfer for them, and gave them to her husband, with the understanding that they were to be loaned to a firm of brokers with whom the husband had been dealing in stock speculations. The wife knew that her husband had dealings with the brokers. The securities were transferred out of her name, and were used as security for the speculative transactions of her husband. The brokers subsequently failed and, at the time a receiver was appointed, certain of the wife's securities were found mingled with other securities of the firm in the possession of a bank as collateral security for a loan made to the firm. All of these securities were subsequently sold. Dividends on the stock were paid to the wife until the failure. *Held,* that the wife was not entitled to a preference over the general creditors of the brokers.

Argued Jan. 25, 1898. Appeal, No. 111, Jan. T., 1897, by defendant, from decree of C. P. No. 3, Phila. Co., June T., 1893, No. 701, dismissing bill in equity. Before STERRETT, C. J., WILLIAMS, McCOLLUM, MITCHELL and FELL, JJ. Affirmed.

Exceptions to master's report.

The case was referred to G. Heide Norris, Esq., as master, who reported as follows :

### FINDINGS OF FACTS.

The master finds the following facts :

1. Prior to May 21, 1893, the plaintiff, Annie G. Summers, a married woman, wife of William D. Summers, was the owner, inter alia, of three hundred shares of the capital stock of the Pennsylvania R. R. Co., and prior to January 21, 1887, was the owner of one hundred shares of the capital stock of the Green & Coates Street Passenger Railway Company.

2. The plaintiff had, for a number of years, entrusted the management of all her securities and their custody to her husband for the purpose of exchanging or of reinvesting the proceeds of them in other securities in his discretion. She trusted entirely to him in the management of her estate, and was governed by his advice in the matter.

3. On May 21, 1883, at the request of her husband, the plaintiff delivered to him three certificates of one hundred shares each for the three hundred shares of Pennsylvania R. R. stock, and signed and delivered to him three irrevocable blank powers of attorney in regular form, to transfer the same. On January 21, 1887, she delivered to him a certificate for one hundred shares of the Green & Coates Street Passenger Railway stock, accompanied by similar powers of attorney. All of the above powers were witnessed by her husband.

4. Mr. Summers procured the certificates and powers of attorney for the two blocks of stock from his wife for the stated purposes, understood by her, of loaning them to Robert Laughlin, of the firm of Laughlin & McManus, the defendants, for use as collateral in the business of the firm. He informed his wife that Mr. Laughlin had requested the loan of these stocks, as they could be more readily used to borrow money upon than other securities in the possession of the firm. He told his wife that he would get value for them.

5. Mr. Summers had been for twelve or thirteen years engaged in extensive speculative transactions through Laughlin & McManus, and also on joint account with members of that firm, and had also been speculating through a number of other brokers. Mrs. Summers knew that her husband had dealings

with brokers, but did not know the nature of the business when she transferred the stocks in controversy.

6. The three hundred shares of Pennsylvania stock were delivered by Mr. Summers to Laughlin & McManus, accompanied by the three powers of attorney, immediately after the execution of the same, on May 21, 1883, and the one hundred shares of the Green & Coates stock were delivered to them in like manner on January 21, 1887.

7. Upon the delivery of the three hundred shares of Pennsylvania stock to Laughlin & McManus, they handed to Mr. Summers, by way of security, and as an exchange of collateral, between one thousand two hundred and one thousand five hundred shares of the Pittsburg, Titusville & Buffalo stock, which were of about equal value at the time. This stock was subsequently handed back by Mr. Summers to Laughlin & McManus, without Mrs. Summers's knowledge, as collateral in certain speculative transactions of his, but there is no evidence that she was aware that her husband had received this stock in exchange or as security for her Pennsylvania Railroad stocks. The Green & Coates stock was given to Laughlin & McManus by Mr. Summers, without the knowledge of his wife, as collateral in the purchase of one hundred shares of Columbia gas stock for him by them. These one hundred shares were afterwards sold by him. Laughlin and McManus knew that the Pennsylvania and Green & Coates stock originally belonged to Mrs. Summers, for the certificates were in her name when they came into their possession.

8. These stocks were used as collateral, and money borrowed upon them by Laughlin & McManus, from time to time, with Mr. Summers's knowledge, and they were transferred out of Mrs. Summers's name, as follows: One hundred shares of Pennsylvania to Shoemaker & Co., July 10, 1891; two hundred shares of Pennsylvania to Walter H. Snyder, May 28, 1891; one hundred shares of Green & Coates to Walter H. Snyder, December 15, 1891. New powers were executed by Mrs. Summers, at her husband's request, and witnessed by him on August 23 and September 13, 1889, for the two hundred shares of Pennsylvania transferred to Walter H. Snyder. Mr. Summers knew at the time that the bank had required the new powers in order to make transfers.

9. Both before and after the transfer out of Mrs. Summers's name, the dividends were regularly collected on the two blocks of stock by Mr. Summers for his wife. Before the transfer they were collected on orders signed by Mrs. Summers, and afterwards by him through the instrumentality of Laughlin & McManus.

10. Mrs. Summers never had any personal dealings with Laughlin & McManus, her husband always acting as the intermediary, but she knew that the stocks had been put into their possession. She never made any demand from them from the time of delivery, March 21, 1883, and January 21, 1889, until the bill was filed, July 17, 1893. She knew that they had been transferred out of her name in October, 1891. She never personally received anything for these stocks.

11. The two blocks of stock were treated by the receiver and by Laughlin & McManus as having been deposited with them as the property of, and as security for, the transactions of Mr. Summers. These transactions were speculative, but they appear to have been regular contracts of purchase and sale as far as Laughlin & McManus were concerned. With the usual result in such cases Mr. Summers made heavy losses, involving most of the securities belonging to his wife which were capable of hypothecation.

12. At the time of the failure of Laughlin & McManus, on March 2, 1893, they had not returned either block of stock to Mr. Summers or to the plaintiff, but the receiver credited Mr. Summers's account on the books of Laughlin & McManus with the sum of $28,125 received as the proceeds of three hundred shares of Pennsylvania stock, and one hundred shares of Green & Coates stock. Mr. Summers owed Laughlin & McManus at the time of their failure about $100,000 on various accounts.

13. When the receiver was appointed there were in the possession of the Farmers' & Mechanics' Bank certain shares of stock of various corporations and other securities of the value of $103,288.29, as collateral for the loan to Laughlin & McManus of $89,500. The difference between the value of the securities held by the Farmers' & Mechanics' Bank and the debt due by Laughlin & McManus, after adjusting the interest, amounted to $12,276.19 in their favor, but among the securities in the hands of the bank were $27,790.52 in public building

due bills which were claimed by Douglass Bros., who had, ac-
cording to their claim, merely hypothecated the due bills in a
lot of $150,990.04 with Laughlin & McManus for a loan of
over $117,000.    For various reasons, as these due bills were in
danger of being sacrificed, your honorable court made an order
under date December 20, 1893, on petition, in consequence of
which collection was made upon the building certificates by
joint action of Douglass Bros. and the receiver, and the sum of
$21,498.88 was conceded to Douglass Bros., and $6,000 to the
receiver, and the said amounts respectively paid to them.    This
division was made in respect of the said entire blocks of build-
ing certificates, in compromise as aforesaid of conflicting claims
to ownership by Douglass Bros. and the receiver.    This $6,000
in due bills was all that the receiver actually obtained in ad-
justment of the indebtedness between Laughlin & McManus
and the various parties, including the Farmers' & Mechanics'
Bank, who held the public building due bills as collateral for
loans to Laughlin & McManus, and the claim of the Farmers'
& Mechanics' Bank having thus been settled, it handed over
to the receiver ten shares of Kensington Bank stocks as surplus
collateral.

14. Among the securities with the Farmers' & Mechanics'
Bank was a block of three hundred shares of Pennsylvania Rail-
road stock and one hundred shares of Green & Coates stock,
deposited January 5, 1893.    These were sold in March, 1893,
for the sum of $28,125.

Two hundred of these shares of Pennsylvania stock were in
a certificate issued in place of a certificate for a like number
of shares in the name of Annie G. Summers, and the one hundred
shares of Green & Coates stock were in a certificate likewise
issued in the place of one for a similar amount in Mrs. Sum-
mers's name.    The above may be considered as the stock orig-
inally belonging to her, but it is impossible to thus identify the
other one hundred shares of Pennsylvania stock, as they had
passed through a number of hands and were mixed up with
other blocks of the same stock in which Laughlin & McManus
were interested.    The evidence on the subject is that one hun-
dred shares of Pennsylvania stock passed under the power dated
March 21, 1883, from Mrs. Summers to Walter H. Snyder.    He
transferred them to Shoemaker & Co., and on March 11, 1892,

Shoemaker & Co. transferred a block of one thousand shares back to Walter H. Snyder.


### CONCLUSIONS.

It is difficult to see, under the facts as found, how the plaintiff is entitled to recover her stock or the value thereof from the receiver, by way of preference over the other creditors, as prayed for in the bill. According to her own testimony and that of her husband she loaned both blocks of stock to Laughlin & McManus to use as collateral. This they proceeded to do from the time of delivery, and thus they appeared to have remained until the receiver was appointed. Whether Laughlin & McManus used the money raised upon the stocks for their own use, or for the use of Mr. Summers in speculation, is of no moment in this controversy, for having used the stock in one way or the other in accordance with the purposes for which the plaintiff says it was put in their possession, they cannot be said to be guilty of any breach of trust. If they have not committed a breach of trust, the plaintiff is not entitled to follow, claim or recover the value of the stocks by way of preference from the receiver. She is no more than a common creditor in this respect : Bank of Commerce v. McMurray, 98 Pa. 538. Her counsel now concedes that she cannot recover the stock itself or its full value, but claims only whatever may be the value of it beyond the amount for which it was hypothecated by Laughlin & McManus.

The total indebtedness to the Farmers' & Mechanics' Bank was $89,500, and the value of the stocks deposited at various times was $103,287.29. The list of collateral produced from the books shows the approximate value of each item of collateral, and the master is asked to apportion the equity of the plaintiff's stock, and to decide that she is entitled to a preference as to that.

Now, while it may be said that she has succeeded in directly tracing some of the stocks formerly belonging to her from Laughlin & McManus to the Farmers' & Mechanics' Bank they were converted long before the receivership, and so commingled with other securities as collateral that the master is of opinion that she cannot point out or claim as belonging to her any proportion of the balance of the proceeds of the sale of all

of the securities after the loan was repaid.  It is true that the stocks were not sold or turned into cash until after the appointment of the receiver, but they had passed out of the control of Laughlin & McManus, and were sold, not by them or the receiver, but by the pledgee who had held them since January, 1893, if not before that time.  The balance after the sale of all the collateral was turned over to the receiver or accounted for to him, but it is impossible to distinguish, under the circumstances, between any right of the plaintiff to share in the fund thus realized and the right of the owners of the other stocks or of every other creditor.  We do not know how much the stocks were hypothecated for, what was the amount loaned on their security from time to time, or what was the proportional amount loaned on the other securities.  None of these except the Kensington Bank stock belonged to Laughlin & McManus.  The proportional value of the securities to the balance furnishes no equitable standard of adjustment under such circumstances.

If there ever was a case in which the rule forbidding recovery by way of preference, where there is a commingling of securities, or where the means of ascertainment of the specific property fails should be applied, this seems to be one of the most appropriate: Thompson's App., 22 Pa. 16 ; People's Bank's App., 93 Pa. 107 ; Freiberg v. Stoddard, 161 Pa. 259 ; Jamison's Estate, 163 Pa. 143.

Moreover, it would seem to the master that if the stocks were given by Mrs. Summers to Laughlin & McManus for use as collateral, the fact that there was value in them above the amount borrowed can make no difference to the plaintiff's claim.  There was no breach of trust as regards the use of the stocks, and she is but a common creditor, if creditor at all, in this respect, and should claim before the auditor of the receiver's account the balance, whatever it may be, as a part of the ˙actual value of the stock.

The plaintiff's counsel placed great reliance upon the testimony of Mr. Summers that Mr. Laughlin had told him on one occasion that the Pennsylvania stock would never go out of his wife's name, and not to worry over it, and also ˙ that after the Green & Coates stock had been transferred from Mrs. Summers's name, on questioning Mr. Laughlin about it, he had said to Mr. Summers that " after this little scare is over, I will see that it is placed back."

Neither of these conversations were denied by Mr. Laughlin, but the master is unable to see how the testimony, if true, furthers the contention of the plaintiff for a preference.

It appeared in the testimony that the stock was transferred out of Mrs. Summers's name in consequence of the requirements of the bank with which it was used as collateral. The lender was unwilling to loan money on stock in the name of a married woman without actual transfer. Now, as Mrs. Summers assented to the use of her stock as collateral by Laughlin & McManus, her assent carried with it the right to do what was necessary in carrying out such purpose. There is nothing to show that she made any conditions about transfer from her name when she handed the stock to her husband, and in giving him the powers of attorney she furnished him with the appropriate means by which the transfers were made possible. He in turn handed these papers to Laughlin & McManus. Their assurance (which there is nothing to show occurred, when they received the Pennsylvania stock originally) that it should never go out of Mrs. Summers's name, and that the Green & Coates stock would be placed back in her name, gives her no further rights than such as she would have as an ordinary creditor as lender of the stock to them for their use as collateral.

Mr. Summers said that he knew that his wife's stock was being used as collateral, and he assented to such use. He certainly had sufficient experience in stock transactions to know what that meant, and cannot rely upon a promise inconsistent with the use for which, according to his own testimony, he delivered it. It is also in evidence that Mr. Summers actually knew that some of the stocks were to be transferred out of his wife's name, for new powers of attorney for two hundred shares were executed by her on August 23 and September 13, 1889, for this purpose; the demand of the bank which held them as collateral, and the reason therefor having been communicated to him at the time.

Great stress was laid upon the fact that Mrs. Summers received the dividends upon all the stock in controversy up to the time of the failure of Laughlin & McManus, and it was argued that this was an admission of Mrs. Summers's continuing ownership. This is not inconsistent either with her theory of the case or with that of the defendants. If the stocks were

loaned to Laughlin & McManus for their benefit, they would naturally pay her the dividends as they accrued, because they only required the use of the stocks as collateral, while if Laughlin & McManus regarded the stocks as collateral for the transaction of the husband, and as belonging to him, they might well pay him the dividends or let him collect them until he chose to pay his debts, for which they claimed to hold the stocks, or until he redeemed them by return of the securities given in exchange, according to his account of the affair.

Exceptions to the master's report were overruled, and a decree was entered dismissing the bill.

*Error assigned* was decree of the court.

*E. Spencer Miller*, for appellant.

*Thomas R. Elcock* and *John G. Johnson*, with them *Bernard Gilpin*, for appellees.

PER CURIAM, July 21, 1898 :

This appeal, from the decree confirming the master's report and dismissing plaintiff's bill was argued with No. 110, of January term, 1897, McManus v. Laughlin et al., Annie G. Summers, appellant, in which a per curiam opinion affirming the decree has just been filed, ante, p. 312.

A careful consideration of the record has satisfied us that there is no substantial error in the decree. It is the logical result of facts properly found by the master and approved by the court. We find nothing in any of the questions raised by the assignments of error that requires special notice.

Decree affirmed and appeal dismissed at appellant's costs.